# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MICHELE BABETTE LAMANTIA,

    Plaintiff,

    v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,[1]

    Defendant.

No. 16 C 2691

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Michele Babette Lamantia filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Title II and XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et. seq., 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. For the reasons stated below, the Commissioner's decision is affirmed.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill.

---

[1] On January 23, 2017, Nancy A. Berryhill became Acting Commissioner of Social Security and is substituted for her predecessor as the proper defendant in this action. Fed. R. Civ. P. 25(d).

2001).[2] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standards for determining DIB and SSI are virtually identical. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI benefits on December 3, 2009, alleging that she became disabled on September 15, 2008, due to grand mal seizures, prior heart attack, depression, high blood pressure, asthma, allergies, and left ankle problems. (R. at 20, 424). The application was denied initially and upon reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 20, 163–66, 216–24). Plaintiff, represented by counsel, appeared and testified at a hearing before an Administrative Law Judge (ALJ) on February 15, 2012, and at a supplemental hearing on October 16. (*Id.* at 20, 84–162). The ALJ denied Plaintiff's request for benefits on November 30, 2012. (*Id.* at 20, 170–81). After Plaintiff filed a request for review, the Appeals Council (AC) vacated the November 30 decision and remanded the case for further proceedings. (*Id.* at 20, 190–92).

On May 12, 2014, Plaintiff, represented by counsel, testified at a remand hearing before a different ALJ. (R. at 20, 42–83). The ALJ also heard testimony from Thomas A. Gusloff, a vocational expert (VE), Judy Panek, M.D., a medical expert (ME), and David L. Biscardi, Ph.D., another ME. (*Id.* at 20, 42–83, 351–55).

The ALJ denied Plaintiff's request for benefits on September 18, 2014. (R. at 20–33). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since September 15, 2008, the alleged onset date. (*Id.* at 24). At step two, the ALJ found that Plaintiff's seizure disorder, degenerative cervical spine arthritis, arthralgias, left ankle fracture history, history of coronary artery disease, depression, and history of sub-

stance abuse are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff's impairments, including the substance abuse disorder, meet listing 12.09. (*Id.* at 24–25). If Plaintiff stopped the substance use, the ALJ found the remaining limitations would cause more than a minimal impact on Plaintiff's ability to perform basic activities. (*Id.* at 26). Further, if Plaintiff stopped the substance use, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations.[3] (*Id.* at 26–27).

The ALJ then assessed Plaintiff's Residual Functional Capacity (RFC)[4] and determined that if she stopped the substance abuse, she could perform light work, except:

> [Plaintiff] can occasionally operate foot controls with the left foot, [Plaintiff] can never climb ladders, ropes, or scaffold [*sic*], [Plaintiff] can occasionally climb ramps/stairs, stoop, crouch, kneel, crawl; [Plaintiff] can balance on a frequent basis. [Plaintiff] can occasionally perform overhead manipulation. [Plaintiff] is to avoid extreme concentrated exposure to extreme cold, heat, dust, and fumes. [Plaintiff] is to avoid work at unprotected heights and heavy moving machinery. [Plaintiff] is limited to simple, routine, repetitive work, 1–3 step tasks, interact occasionally with the public, co-workers and supervisors.

(R. at 27; *see id.* at 27–31). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that if Plaintiff stopped the substance use, she would

---

[3] A person who is otherwise disabled cannot receive SSI or DIB benefits if alcoholism or drug addiction is a "contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

be unable to perform any past relevant work. (*Id.* at 31). At step five, based on Plaintiff's RFC, her vocational factors, and the VE's testimony, the ALJ determined that if Plaintiff stopped the substance use, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including photocopy machiner, inserting machine operator, and bagger of garments. (*Id.* at 31–32). Even if Plaintiff was limited to sedentary work with the same nonexertional limitations, the VE testified there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including cutter and paster, information clerk, and toy stuffer. (*Id.* at 32). Accordingly, the ALJ concluded that the substance use disorder is a contributing, material factor because Plaintiff would not be disabled if she stopped the substance use. (*Id.*). Therefore, Plaintiff is not suffering from a disability as defined by the Act. (*Id.* at 32–33).

The Appeals Council denied Plaintiff's request for review on November 10, 2015. (R. at 6–8). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue,* 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in gen-

eral, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks eviden-

tiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff first began experiencing seizures at age 16, following a fall. (R. at 862). They became worse but by 2009, she experienced them only three times per year. (*Id.* at 857, 862).

On May 17, 2007, Plaintiff presented to the emergency room after passing out at home. (R. at 694). She reported drinking more than usual. (*Id.*). On June 5, she presented to the emergency room for an evaluation of psychosis. (*Id.* at 629). She acknowledged drinking heavily for the prior two weeks. (*Id.* at 629–30). She was diagnosed with alcohol intoxication, possible medication reaction, and possible psychosis. (*Id.* at 630). On June 8, Plaintiff was admitted to the hospital with a diagnosis of acute alcohol intoxication. (*Id.* at 627). On July 15, 2008, she was admitted to the hospital after complaining of shakiness. (*Id.* at 730). Her boyfriend reported that she had been drinking heavily the night before; her blood alcohol concentration (BAC) in the emergency room was 0.40.[5] (*Id.*). She was assessed with shakiness, most probably secondary to hypoglycemia, history of seizure disorder, and alcohol abuse. (*Id.* at 731).

On January 6, 2009, Roopa K. Kari, M.D., performed an internal medicine consultative examination on behalf of the Commissioner. (R. at 856–60). Plaintiff was

---

[5] Legal intoxication is defined as having a BAC of 0.08 or greater. The observable effects of a BAC of 0.40–.49 include trouble breathing, coma, and possible death. <http://www.webmd.com/mental-health/addiction/blood-alcohol> (last visited July 25, 2017).

able to get on and off the exam table and ambulate 50 feet without support. (*Id.* at 859). Her gait was nonantalgic, range of motion normal, and straight leg test negative. (*Id.*). Dr. Kari's diagnostic impression included a history of grand mal seizures, history of coronary artery disease, depression, history of asthma, history of hypertension, and history of alcoholism. (*Id.*).

On the same day, Barbara F. Sherman, Psy.D., performed a psychological examination on behalf of the Commissioner. (R. at 862–67). Plaintiff admitted to prior daily use of alcohol before entering a rehabilitation program; she had been in remission but relapsed recently following her mother's sudden death. (*Id.* at 863, 866). In the prior year, she was hospitalized after unintentionally taking an overdose of sleeping medications. (*Id.* at 866). Plaintiff reported no problems with socialization and generally can take care of herself but needs supervision at all times because of her seizure history. (*Id.* at 864). She cries often, is sometimes lethargic, has impaired concentration, appetite and sleeping, but denied hallucinations, delusions, and suicidal or homicidal ideations. (*Id.* at 864–65). On examination, Plaintiff was not fully time oriented, but was oriented to person and place. (*Id.* at 864). Her speech, concentration, memory, fund of knowledge, and conceptual and calculation abilities were all normal. (*Id.* at 865). She did exhibit some attention and judgment deficits. (*Id.*). Dr. Sherman diagnosed alcohol abuse disorder, posttraumatic stress disorder, major depression, single episode, and seizure disorder. (*Id.* at 866).

Plaintiff was admitted to the Good Samaritan Hospital on January 12, 2009, after complaint of shortness of breath. (R. at 875). She acknowledged that she had

stopped taking her seizure medicines six to eight weeks prior. (*Id.* at 875). She was diagnosed with alcohol intoxication, along with chest pain and seizure disorder. (*Id.* at 878). The attending physician advised her to stop drinking and resume her seizure medications, which he advised her should be inexpensive since they are generic. (*Id.* at 879).

On January 16, 2009, Elizabeth Kuester, M.D., a nonexamining DDS physician, completed a Psychiatric Review Technique report. (R. at 884–97). She concluded that Plaintiff was mildly limited in activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. (*Id.* at 894).

On January 30, 2009, George Andrews, M.D., a nonexamining DDS physician, completed a physical RFC assessment. (R. at 898–905). He opined that Plaintiff could occasionally lift 50 pounds, frequently 25 pounds, and stand, walk or sit six hours in an eight-hour workday. (*Id.* at 899). He concluded that Plaintiff has no postural, manipulative, visual, or communicative limitations, but should avoid concentrated exposure to fumes and hazards. (*Id.* at 900–02). On April 6, 2010, Reynaldo Gotanco, M.D., another nonexamining DDS physician, largely affirmed Dr. Andrews's assessment, but opined that Plaintiff should also avoid concentrated exposure to cold. (*Id.* at 1083–90). On September 10, 2010, Bharati Jhaveri, M.D., another nonexamining DDS physician, affirmed Dr. Gotanco's assessment. (*Id.* at 1302–04).

On October 31, 2009, Plaintiff was admitted to Central DuPage Hospital following a generalized tonic clonic seizure. (R. at 939). Her boyfriend reported that she

had been drinking alcohol the night before and had a brief seizure before going back to bed. (*Id.*). The attending physician assessed seizures. (*Id.*). The physician could not conclude whether it was an alcohol withdrawal seizure "but clearly if she has epilepsy then she is noncompliant with her medications, as her Dilantin level shows a very low level as well as the Depakote." (*Id.*).

Plaintiff presented to the emergency room for another possible seizure on November 9. (R. at 977). The attending physician concluded that the seizure was caused by being noncompliant with her medications along with alcohol intoxication. (*Id.*). The doctor explained to Plaintiff that any quantity of alcohol will lower her seizure threshold. (*Id.*). She returned to the emergency room on December 29 for a seizure, after drinking heavily. (*Id.* at 1023). The attending physician explained that alcohol not only lowers the seizure threshold but that heavy drinking can also trigger an alcohol withdrawal seizure. (*Id.*).

On February 17, 2010, Ravikiran N. Tamragouri, M.D., performed a physical examination on behalf of the Commissioner. (R. at 1065–67). The examination was largely unremarkable. Plaintiff had full range of motion without difficulty, no ankle or leg edema, full power and strength, and normal gait and ambulation. (*Id.* at 1066–67). Dr. Tamragouri's diagnostic impression included seizures that increased in frequency because of medication noncompliance and alcohol abuse; myocardial infarction history and hypertension; asthma history; and left ankle flat foot—but no gait disturbance during examination. (*Id.* at 1067).

On March 5, Plaintiff was unresponsive and was transported to Central DuPage Hospital. (R. at 1145). Henry C. Echiverri, M.D., noted an underlying history of seizure disorder and alcohol abuse. (*Id*.). As recently as December 2009, Plaintiff was reported to be drinking up to one pint of vodka daily. (*Id*. at 1146). She has been hospitalized "multiple times for episodes of seizure that were presumed to be at least partially contributed to by alcohol." (*Id*.). A CAT scan of the brain was normal. (*Id*. at 1145). Dr. Echiverri's diagnostic impression was "probable alcohol-induced breakthrough seizures in a patient who most likely has an underlying seizure disorder." (*Id*.). He also found that Plaintiff has hyperammonemia.[6] Dr. Echiverri prescribed Keppra and continued phenytoin and high dose thiamine.[7] (*Id*.).

Sunil Matiwala, M.D., also examined Plaintiff while she was in the hospital. (R. at 1146–47). He noted that Plaintiff has a history of alcohol abuse, coronary heart disease and a seizure disorder, and was admitted with a profoundly altered mental status. (*Id*. at 1147). Dr. Matiwala opined that with Plaintiff's low platelets and her alcohol history and hyperammonemia, "the clinical picture suggests that of alcohol cirrhosis." (*Id*.).

James B. Augustinsky, M.D., was also consulted while Plaintiff was in the hospital. (R. at 1150–51). He noted that Plaintiff has a long history of alcohol abuse and

---

[6] Hyperammonemia is elevated ammonia levels in the blood, which is often the consequence of a diseased liver. <http://emedicine.medscape.com/article/944996-overview> (last visited July 18, 2017)

[7] Keppra (levetiracetam) and phenytoin are anti-epileptic drugs. <www.drugs.com> (last visited July 18, 2017).

hepatic encephalopathy. (*Id.* at 1150). His assessment included alcohol abuse, hepatic encephalopathy, seizure disorder, and coronary artery disease. (*Id.* at 1151).

On March 10, 2010, Joseph Martin Nemeth III, M.D., performed a psychiatric evaluation on behalf of the Commissioner. (R. at 1081–82). Plaintiff did not exhibit any postural abnormalities or gait disturbances. (*Id.* at 1081). She acknowledged a history of alcohol abuse but denied drinking "in some time." (*Id.*). She reported feeling depressed, anxious and agitated, but denied suicidal ideations and denied auditory or visual hallucinations. (*Id.*). Dr. Nemeth diagnostic impression included depression and chronic alcoholism. (*Id.* at 1082). He opined that Plaintiff was incapable of handling her own funds. (*Id.*).

On April 15, 2010, Howard Tin, Psy.D., a nonexamining DDS physician, completed a Psychiatric Review Technique form. (R. at 1091–104). He concluded that Plaintiff has depression NOS and alcoholism, chronic type. (*Id.* at 1094, 1099). He opined that Plaintiff was mildly limited in activities of daily living but moderately limited in maintaining social functioning and maintaining concentration, persistence or pace. (*Id.* at 1101). Dr. Tin also completed a mental RFC assessment. (*Id.* at 1105–07). He opined that Plaintiff was moderately limited in her ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; and set realistic goals or make plans independently

of others. (*Id.* at 1105–06). Dr. Tin concluded that Plaintiff is capable of performing simple tasks that do not require interaction with the general public. (*Id.* at 1107). On September 9, 2010, Donald Henson, Ph.D., another nonexamining DDS physician, affirmed Dr. Tin's assessment. (*Id.* at 1302–04).

On May 3, Plaintiff went to the Central DuPage Hospital emergency room complaining of nausea, vomiting and diarrhea and being unable to keep her seizure medicine down. (R. at 1192–93). She denied current alcohol intake but acknowledged occasional binge drinking. (*Id.* at 1193). She later admitted that she had been drinking the day before after a blood test indicated a serum ethanol level of 68 mg/dl.[8] (*Id.* at 1194).

Plaintiff was admitted to Central DuPage Hospital on May 5, 2010, after she attempted suicide by overdosing on alcohol and trazodone. (R. at 1203–05). Her serum ethanol level on admission was 345 mg/dl, which is equivalent to a BAC of 0.35.[9] (*Id.* at 1205). She became suicidal after recent stressors, including recurring seizures occurring approximately monthly for the last 27 years, her mother's recent death, and losing her job. (*Id.* at 1203). Plaintiff also reported manic and depressive symptoms, including reduced appetite and insomnia. (*Id.*). She reported drinking twice weekly with rare binges and one prior DUI. (*Id.* at 1204).

---

[8] A serum ethanol level of 68 is equivalent to a BAC of 0.07. <http://emedicine.medscape.com/article/2090019-overview> (last visited July 18, 2017).

[9] The observable effects of a BAC of 0.30–.39 include passing out, tremors, memory loss, and cool body temperature. <http://www.webmd.com/mental-health/addiction/blood-alcohol> (last visited July 25, 2017).

Nadeem Hussain, M.D., conducted a psychiatric examination. (R. at 1204–05). He assessed multiple stressors related to loss of function from a chronic seizure disorder and social stressors including the death of her mother, estrangement from her family, divorce, job loss, all of which caused her to become depressed and suicidal. (*Id.* at 1205). Dr. Hussain diagnosed major depressive disorder, with possible PTSD, and assigned a Global Assessment of Functioning (GAF) score of 30.[10] (*Id.*). Upon discharge from inpatient psychiatry on May 17, Plaintiff was diagnosed with major depression, recurrent, and assigned a GAF score of 50.[11] (*Id.* at 1232–33).

On June 1, Plaintiff attempted suicide after drinking heavily and taking a handful of Lunesta tablets. (R. at 1243). Her serum ethanol level on admission was 406 mg/dl, which is equivalent to a BAC of 0.41. (*Id.* at 1245). Andrew Korcek, M.D., assessed her with an altered mental status associated with drug and alcohol abuse and recommended a psychiatric evaluation. (*Id.*). Upon discharge on June 8, Dr.

---

[10] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter *DSM–IV* ). A GAF of 21–30 indicates that "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g. stays in bed all day, no job, home or friends)." *Id.* at 34. The Court notes that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013); *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012).

[11] A GAF score of 41–50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *DSM-IV* at 34.

Hussain diagnosed Plaintiff with alcohol dependence and major depressive disorder, with possible PTSD, and assigned a GAF score of 35.[12] (*Id.* at 1276–77).

On July 12, Plaintiff voluntarily admitted herself to Central DuPage Hospital for a psychiatric evaluation after expressing suicidal ideations. (R. at 1284). The attending physician diagnosed psychotic suicidal ideation, history of suicidal ideation, clinical alcohol ingestion, and alcohol intoxication. (*Id.* at 1285).

On February 9, 2012, Helga Sommer-Perry, a Mental Health Professional (MHP), completed a mental health assessment. (R. at 1486–97). Plaintiff reported intermittent crying spells, insomnia, anorexia, obsessive behavior, recurring seizures, and lack of self-care. (*Id.* at 1486). Current psychosocial stressors include mother's death, family conflicts, financial challenges, homelessness, illness, medicine noncompliance, recent hospitalizations, substance abuse, and unemployment. (*Id.* at 1487). A mental status evaluation was largely unremarkable. (*Id.* at 1493–94). The MHP diagnosed major depressive disorder, recurrent, severe without psychotic features and assigned a GAF score of 53.[13] (*Id.* at 1495–96).

---

[12] A GAF score of 31–40 indicates some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed and avoids friends, neglects family, and is unable to work). *DSM-IV* at 34.

[13] A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM–IV* at 34.

Plaintiff was admitted to Central DuPage Hospital on July 30, 2013, after experiencing malaise and breakthrough seizure.[14] (R. at 1708). On admission, she was found to have suspected rhabdomyolysis.[15] Roy Sucholeiki, M.D., noted that Plaintiff has a history of alcohol abuse and a chronic seizure disorder, and may have missed some anticonvulsant dosing. (*Id.*). Dr. Sucholeiki opined that Plaintiff's breakthrough seizure may have been related to rhabdomyolysis stress. (*Id.*). He continued her Keppra dosage but considering whether to start a different seizure medication. (*Id.*). On August 1, Dr. Sucholeiki started Zonegran with the plan to slowly increase dosage over the next couple of weeks.[16] (*Id.* at 1711). He noted that Plaintiff's depression and anxiety are under control with medications. (*Id.* at 1709).

At the May 2014 hearing, Dr. Panek testified as a medical expert. (R. at 54–64). She reviewed the medical record and opined that Plaintiff's impairments include seizure disorder, cervical spine degenerative arthritis, arthralgias, history of left ankle fracture, and history of coronary artery disease. (*Id.* at 55, 57–58). Dr. Panek concluded that Plaintiff's physical impairments do not meet or equal any of the listings, including listings 1.02, 1.04, 4.0, 11.02 or 11.03. (*Id.* at 58–59). She opined that

[14] "A breakthrough seizure is an epileptic seizure that occurs despite the use of anticonvulsants that have otherwise successfully prevented seizures in the patient." <https://en.wikipedia.org/wiki/Causes_of_seizures> (last visited July 18, 2017).

[15] "Rhabdomyolysis is a condition in which damaged skeletal muscle breaks down rapidly. Symptoms may include muscle pains, weakness, vomiting, and confusion. . . . Some of the muscle breakdown products, such as the protein myoglobin, are harmful to the kidneys and may lead to kidney failure. The muscle damage is most often the result of a crush injury, strenuous exercise, medications, or drug abuse.
<https://en.wikipedia.org/wiki/Rhabdomyolysis> (last visited July 18, 2017).

[16] Zonegran (zonisamide) "is used together with other anti-convulsant medications to treat partial seizures in adults with epilepsy." <www.drugs.com> (last visited July 18, 2017).

Plaintiff is capable of lifting 20 pounds occasionally and 10 pounds frequently, can stand or walk six hours in an eight-hour workday, and requires a pedal for her left foot. (*Id.* at 60–61). Upon questioning by Plaintiff's attorney, Dr. Panek explained that she gave a light rather than a sedentary RFC because of examinations that found a nonantalgic gait, normal sensory response, and normal neurological results. (*Id.* at 62–63).

Dr. Biscardi also testified at the hearing as a medical expert. (R. at 64–70). He reviewed the medical record and noted that since 2012, Plaintiff has been drug- and alcohol-free since and her mental status exams have been grossly normal. (*Id.* at 64, 67–68). He opined that Plaintiff retains the mental capacity to understand, remember, and carry out one- to three-step tasks, interact occasionally with coworkers and supervisors, and adapt to stressors and changes in this type of workplace. (*Id.* at 67). He concluded that Plaintiff's moderate limitations in concentration, persistence, and pace would require her to be limited to simple, routine competitive work. (*Id.* at 69). Finally, Dr. Biscardi opined that as of the time of the hearing, alcohol dependence would not be a contributing factor material to Plaintiff's disability. (*Id.* at 82).

## V. DISCUSSION

In support for her request for reversal, Plaintiff argues that the ALJ's step three and RFC determinations were erroneous. (Dkt. 17 at 1, 6–15).

## A. The ALJ Properly Determined That Plaintiff's Impairments, Including Alcoholism, Were Disabling

A person who is otherwise disabled cannot receive SSI or DIB benefits if alcoholism or drug addiction is a "contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). Thus, "[w]hen an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled." *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006); see 20 C.F.R. § 404.1535(b)(1) ("The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol."). If the ALJ finds that the claimant would still be disabled if she stopped using drugs or alcohol, "she is deemed disabled 'independent of [her] drug addiction or alcoholism' and is therefore entitled to benefits." *Kangail*, 454 F.3d at 629 (quoting 20 C.F.R. § 404.1535(b)(2)(ii)).

Plaintiff erroneously contends that the ALJ "committed legal error by proceeding to the ultimate conclusion [that Plaintiff's alcoholism was a contributing factor material to the determination of disability] without first finding the plaintiff was disabled, based upon an assessment of all the medical evidence and all of the impairments in combination." (Dkt. 17 at 7–8). When evaluating a claimant whose medical evidence includes drug addiction or alcoholism, the ALJ first determines the claimant's abilities when she is *not* sober. 20 C.F.R. § 1535(a). Consistent with the regulations, the ALJ first evaluated Plaintiff's condition with her alcoholism included.

(R. at 24–25). He considered her history of hospitalizations related to her substance abuse, seizure disorder, and depression and concluded that Plaintiff's impairments, including her alcoholism, meet listing 12.09. (*Id.*). Thus, the ALJ properly determined that when considering all of Plaintiff's impairments, including her alcoholism, she was disabled. *Zalewski*, 760 F.2d at 162 n.2 (an affirmative answer at step three means that a claimant is disabled).

## B. The ALJ's Step Three Findings Absent Substance Abuse Were Supported by Substantial Evidence

Plaintiff asserts that the ALJ's conclusion that she was not disabled if she stopped abusing alcohol was "not the result of an assessment of the record but a common sense generalization." (Dkt. 17 at 8). Plaintiff argues that the ALJ's determination was "based on the perception that anyone under the influence of alcohol is generally unable to function normally until he or she 'sobers up.'" (*Id.*). Specifically, she contends that the ALJ failed to fully account for her depressive disorder and seizures. (*Id.* at 8–9).

Plaintiff questions the ALJ's finding that absent substance abuse, she has only mild limitations in activities of daily living, moderate limitations in social functioning, and moderate limitations in maintaining concentration, persistence or pace, arguing that the ALJ failed to support his determination with substantial evidence. (Dkt. 17 at 13; *see* R. at 26–27). To the contrary, the ALJ supported his findings with record evidence, noting for example that Plaintiff bikes, volunteers at the PADS organization, rides the bus, attends AA meetings, reads, sews, does crossword puzzles, cooks, drives, and does laundry. (R. at 26–27; *see id.* at 864, 865, 1203,

1595). The consultative examiner noted that Plaintiff's socialization skills are un-problematic and opined that Plaintiff has adequate memory and concentration. (*Id.* at 26–27; *see id.* at 864–65). A psychiatric evaluation in March 2010 found that Plaintiff's mental status was within normal limits; she had good short-term memory and good concentration skills. (*Id.* at 29; *see id.* at 1081–82). The ME reviewed the medical record and after factoring in Plaintiff's depression opined that since Plaintiff became sober in 2012, she has a mild limitation in activities of daily living, a moderate limitation in social functioning, and a moderate limitation in concentration, persistence, or pace with no episodes of decompensation. (*Id.* at 29; *see id.* at 67–69).[17] Indeed, by August 2013 and as noted by the ALJ, Plaintiff's physician opined that Plaintiff's depression and anxiety were under control with medications. (*Id.* at 29, 1709). In any event, the ALJ took Plaintiff's mental impairments absent substance abuse into account by limiting her to simple, routine, repetitive work, one- to three-step tasks, and occasional interactions with the public, co-workers, and supervisors. (*Id.* at 27).

Plaintiff contends that the ALJ failed to take into consideration that not all of her hospitalizations for seizures were alcohol related. (Dkt. 17 at 9–12). But the ALJ correctly noted that Plaintiff's denials of alcohol abuse were contradicted by the record. For example, in May 2010, she presented to the emergency room complain-

---

[17] Plaintiff emphasizes that the ME opined that "alcohol was not a contributing factor to Plaintiff's disability." (Dkt. 17 at 9; *see* R. at 82). But at the time of the May 2014 hearing, Plaintiff had been sober since September 2012. (R. at 47, 67, 1626). The ME testified that his assessments at the hearing were made assuming that Plaintiff was drug- and alcohol-free. (*Id.* at 67, 68, 82).

ing of nausea, vomiting, and diarrhea and being unable to keep her seizure medicine down. (R. at 1192–93). She denied current alcohol use but later admitted that she had been drinking the day before after a blood test revealed a BAC of 0.07. (*Id.* at 1193–94). And in April 2012, as the ALJ noted, Plaintiff's physician concluded that Plaintiff's reports of alcohol use were not credible:

> [Plaintiff's] reports of alcohol use are inconsistent with most recent report of one day binge to intoxication stated to psychiatric staff on 2/9/12 thereby criteria does not qualify for remission. [Plaintiff's] reports of seizures, chronic headaches, labile mood, difficulty with sleep & multiple injuries may be a result of intoxication and/or withdrawal from alcohol use . . . .

(*Id.* at 30) (quoting *id.* at 1511). As one of Plaintiff's doctors admonished her, alcohol not only lowers the seizure threshold but also that heavy drinking can trigger an alcohol-withdrawal seizure. (*Id.* at 1023). Thus, the ALJ concluded that in Plaintiff's case, "[a]lcohol is shown to exacerbate seizures and/or reduce the efficacy of seizure medications." (R. at 25).

Plaintiff argues that while alcohol abuse was present, it was not "the *only* precipitant of Plaintiff's seizures, and hospital admissions therefor." (*Id.* at 12) (emphasis in original). But the ALJ acknowledged that other issues were present besides alcohol use. Indeed, the ALJ reported that Plaintiff's hospitalizations for treatment of seizure disorder reflected not only the presence of heavy alcohol abuse but included other diagnoses. (R. at 24–25, 29) (noting the presence of not only alcohol use but also psychosis, depression, anxiety, suicidal ideation, medicine noncompliance, and PTSD). And the ALJ concluded that even in the absence of substance abuse, Plain-

tiff has other severe impairments, including seizure disorder, degenerative cervical spine arthritis, arthralgias, and depression. (*Id.* at 24).

The ALJ also noted multiple occasions where Plaintiff's seizures were exacerbated by medication noncompliance. (R. at 25, 29, 30) (citing *id.* at 962, 977, 1708; *see also id.* at 1067). Plaintiff argues that during her October 2009 hospitalization, her physician was not able to determine whether alcohol induced her seizure. (Dkt. 17 at 11). But she failed to note, as the ALJ observed, that her physician also concluded that "she is noncompliant with her medications, as her Dilantin level shows a very low level as well as the Depakote." (*Id.* at 939, *see id.* at 25). And while Plaintiff had a breakthrough seizure in July 2013, after she became sober, her physician concluded that she may have missed some anticonvulsant dosing.[18] (*Id.* at 1708). The physician also switched Plaintiff's medication with no reports of any subsequent seizures. (*Id.* at 1711).

---

[18] Plaintiff contends that the ALJ failed to inquire as to why Plaintiff was noncompliant with her medications. (Dkt. 17 at 11–12). To the contrary, the ALJ acknowledged Plaintiff's assertion that she missed a lot of doses because she was homeless and unable to afford her medications. (R. at 30). In evaluating Plaintiff's subjective statements, the ALJ discounted these assertions, noting that during this same time period, Plaintiff was able to afford alcohol. (*Id.* at 30) (citing *id.* at 856–60). In her memorandum seeking review of the ALJ's decision, Plaintiff does not attack the ALJ's subjective symptom evaluation and thus any arguments in this regard are waived. *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a person waives an argument by failing to make it before the district court."); *accord Dzurko v. Colvin*, No. 12 C 03235, 2013 WL 6822659, at *7 (N.D. Ill. Dec. 26, 2013); *see Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver."); *accord Carter v. Astrue*, 413 F. App'x 899, 906 (7th Cir. 2011).

## C. The ALJ's RFC Assessment Properly Considered Plaintiff's Ankle Fracture, Back Pain, and Obesity

Plaintiff contends that the ALJ failed to take her left ankle fracture, back pain, and obesity into effect when determining her RFC. (Dkt. 17 at 13–15). "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); Social Security Ruling (SSR) 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities.").[19] The RFC is based upon medical evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; see 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported

---

[19] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably bound by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administering." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

After carefully examining the record, the Court finds that the ALJ's determination of Plaintiff's RFC was thorough, thoughtful, and fully grounded in the medical evidence. Reviewing the ALJ's decision "as a whole in order to give it the most sensible reading," *Carter v. Colvin*, No. 12 CV 745, 2014 WL 4825272, at *4 n.1 (S.D. Ill. Sept. 29, 2014), the ALJ appropriately considered the combined impact of Plaintiff's severe and nonsevere impairments, *see Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004) ("we will nonetheless give the opinion a commonsensical reading rather than nitpicking at it") (citation omitted).

The ALJ acknowledged her left ankle fracture history, including tenderness, pain, and limited range of motion. (R. at 26, 28–29). The ME reviewed the medical record and opined that Plaintiff is capable of light work and requires a pedal for her left foot. (*Id.* at 60–61). The ALJ adopted the ME's testimony, restricting Plaintiff to light work with only occasional operation of foot controls with her left foot. (*Id.* at 27). And even if Plaintiff was limited to sedentary work with the same nonexertional limitations, the VE testified there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (*Id.* at 32, 74–75).

As to Plaintiff's complaints of back pain, the ALJ noted that her consultative examination was unremarkable. (R. at 28–29; *see id.* at 859). Plaintiff had full range of motion without difficulty, no ankle or leg edema, full power and strength, and normal gait and ambulation. (*Id.* at 1066–67). Plaintiff does not identify any medi-

cal evidence to the contrary.[20] *Punzio*, 630 F.3d at 712 ("The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity.").

Finally, Plaintiff contends that the ALJ failed to take into account the impact of her obesity on her ability to sustain full-time work. (Dkt. 17 at 14–15). The ALJ noted Plaintiff's height and weight and the ME's testimony that Plaintiff is mildly obese. (R. at 26, 60). The ALJ considered the entire, longitudinal record, which included Plaintiff's mild obesity, when determining her RFC. (*Id.* at 26–31); *see Sienkiewicz v. Barnhart*, 409 F.3d 798, 802–03 (7th Cir. 2005) (ALJ found claimant was obese and nothing suggests that he then disregarded that finding when evaluating her RFC).

Plaintiff appears to confuse conditions with disabilities. "A person can be depressed, anxious, and obese yet still perform full-time work." *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005). As the Seventh Circuit explained:

> Conditions must not be confused with disabilities. The social security disability benefits program is not concerned with health as such, but rather with ability to engage in full-time gainful employment. A person can be depressed, anxious, and obese yet still perform full-time work. This point is obscured by the tendency in some cases to describe obesity as an impairment, limitation, or disability. It is none of these things from the standpoint of the disability program. It can be the *cause* of a disability, but once its causal efficacy is determined, it drops out of the picture. If the claimant for social security disability benefits is so obese as to be unable to bend, the issue is the effect of that inability on the claimant's capacity for work.

---

[20] Plaintiff contends that the ALJ failed to discuss physical therapy notations that demonstrated a limited range of motion in the lumbar spine. (Dkt. 17 at 15) (citing R. at 288). But page 288 is a fax cover sheet, which contains no physical therapy notations.

*Id.* (citation omitted) (emphasis in original). Plaintiff fails to demonstrate how her mild obesity combined with her other impairments impacts her ability to work. *Hisle v. Astrue*, 258 F. App'x 33, 37 (7th Cir. 2007) (claimant bears the burden to "articulate how her obesity limits her functioning and exacerbates her impairments"); *Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir. 2006) (claimant must "specify how his obesity further impaired his ability to work") (citation omitted); *see also Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("Skarbek does not explain how his obesity would have affected the ALJ's five-step analysis.").

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [16] is **DENIED**, and Defendant's Motion for Summary Judgment [21] is **GRANTED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is affirmed.

E N T E R:

Dated: August 1, 2017

_____

MARY M. ROWLAND
United States Magistrate Judge